And we will call the final case for today Swiss Re Corporate Solutions America Insurance Corporation Good morning. David Bush is on behalf of the appellant, Swiss Re. I'd like to reserve five minutes for rebuttal, please. Very well. California law draws a bright-line distinction between two separate parts of the Swiss Re policy. First, the policy provides general coverage for premises operations risks. And second, the policy provides a second after-the-fact coverage called the products-completed operations hazard. This after-the-fact coverage applies to injuries arising from work that's already complete or from product liability risks. In California law, it's clear that these two coverage parts do not overlap. One ends where the other begins. The Swiss Re policy recognizes that distinction by assigning each one its own dedicated $25 million limit of liability. In this case, the district court erred by erasing the distinction between these two coverages and finding that the underlying Ferreira judgment falls within the products-completed operations hazard. It doesn't for two primary reasons. First, Terminix's work was still ongoing at the time of the injury. The underlying record establishes that Terminix workers were still on site performing active extermination work. The store was still closed because there was cockroaches in the store. And third, these chemicals that Terminix was spraying at the store were literally still airborne when they formed a cloud of dust around the injured party, Mr. Ferreira, and caused his injuries. So this is not a completed operations claim. Second, it's also not a product liability claim. Terminix admits in this case that the chemicals it sprayed, it didn't manufacture, it didn't distribute, it didn't sell them. However, Terminix is arguing that it handled those chemicals in the context of spraying them, and by handling them, it made them its own product. Handling a product in the context of work doesn't satisfy the requirements of this policy. And so for this injury belongs under the premises operations part of the policy, not the after-the-fact products-completed operations. So help me understand from your point of view, what types of activities would this policy have covered? They bought it for a reason, so what are they insuring against? Sure, so there's a number of activities that this could cover. For instance, before this claim, Terminix was sued for nearly killing a family in the British Virgin Islands. We paid $25 million for that claim. That claim was premised upon Terminix spraying pesticides that, just like Mr. Ferreira, migrated from the area of their application to a different spot of the building and injured that family. And so we recognize that that's a claim that falls within the ongoing operations side of the policy, and we paid it. On the other hand, there was a different claim that we've paid under this policy. It was brought by the Macaulay family in Florida. And Terminix did work at their home, called the family and said, our work is done, it's totally safe to come back to the home. They came back four hours later, after Terminix declared that their work was done. And at that time, they were exposed to pesticides that caused them injuries. So it's repaid that claim under the completed operations side of the policy. So this is not a case where an insurance company is looking for an excuse to deny a claim. This claim would be covered. Ferreira's claim would be covered under the policy. It's just that we've already paid the entire limit of liability for ongoing operations claims. There's no limits left in the policy that Terminix purchased. The briefs also address several secondary issues regarding calculation of interest and amendment of the pleadings. Swiss Re is going to stand on the briefs with respect to those issues, and I'm just going to focus today on the primary issue of the appeal, products completed operations. And so the first reason the district court erred is by failing to acknowledge that Ferreira's injury arose from Terminix's ongoing work. The policy here defines work, your work, to include the work and operations that Terminix performs. And it also includes the materials that it furnishes on the job site, like pesticides, or the tools that it brings, like brooms and sprayers for those pesticides, and the warnings that it provides or doesn't provide, like letting the business next door know that it's going to be pumping pesticides into that shared wall. So when a contractor like Terminix shows up to a job site, the policy recognizes that the things that it brings and uses, those are all part of its work. There's really no dispute here that Terminix is working at Starbucks. The real dispute is, was that work ongoing or complete at the time of the injury? And the policy tells us when Terminix's work can be deemed complete. It's one of two times. The first time is when all of the work required by its contract at this particular location is done. And the second time, the second way it can be deemed complete, is when all of the work's been put to its intended use. Neither one of those are satisfied here. First, all of the work required by the contract was not complete. The record establishes that at the time that they came to the store, there was an active cockroach infestation. The Department of Health in Los Angeles had ordered them to close. And so Starbucks has a service agreement with Terminix that says, when you're called in response to an active department violation that forced the store to close, it controls the duration of their work. And what that part of the contract says is, your work must continue until there's no more pest activity reported at the store. Here, we know exactly when that occurred. It was on May 4th. It was three days after Mr. Ferreira's injury. We also know that in the meantime, Terminix went back to the store. It performed additional work that was required by the contract. Terminix admits this fact in page 164 of the record. It admits that it came back to the store the following day and performed more work that was required by its contract. And so the first way that its work can be deemed complete when all the work is done is not satisfied. The second way it can be deemed complete is when it's been put to its intended use. And so if a house is built and a family moves in, that's a pretty clear sign that the home has been put to its intended use. Or if the family hires a painter to spray new paint on the walls. When the paint hits the walls and dries, that's an obvious sign that it's been put to its intended use. But if the paint is still airborne, flying from the nozzle of the paint sprayer to the wall, no one would say that that paint has already been put to its intended use. Here, the pesticides that hit Mr. Ferreira and injured him were literally still airborne, forming a visible cloud of smoke around him that caused his injuries. So when the workers are still there, when the store is still closed due to an active cockroach infestation, and the chemicals that Terminix sprays are still airborne, that's not a completed operations claim. This claim belongs under the premises operations side of the policy, which was already exhausted by our $25 million payment for the Esmonds family. And so the district court found that, okay, Swiss Re, even if you're right, even if it was ongoing work, Terminix still gets coverage under this side of the policy, this after-the-fact coverage, because the chemicals that they sprayed at Starbucks, those were our products. And in support of that, the district court relied upon the policy's definition of your product. That policy definition states that Terminix's products are the products that it manufactures, sells, distributes, disposes of, and handles. In Fiberboard v. Hartford, California Court of Appeals looked at those words in this sentence, manufacture, sale, and handle, and said they're all part of the same integrated process. They describe how a product moves through the product cycle in the stream of commerce. And the Fiberboard case also is very clear that this product hazard coverage, under the after-the-fact product completing operations hazard, it's supposed to apply to product liability risks. It's not supposed to apply to service work, because that's already covered under the other side of the policy. Can I ask you a question about that? What about the box that I'm, you know, I have this kind of coverage, and I'm selling something, but I put it in a box, or I put it on a pallet? Would that be covered? Even though, you know, you could argue it's not, you could make the argument it's not my product, but the whole point of this is so you can handle your product, so to speak, in the sense that you're arguing for. But the reason I'm asking the question is in the course of doing that, handling sometimes requires the use of things that aren't the product you're selling, the box that comes in. I mean, maybe they can, even, that something comes in. But, you know, the pallet that it's on, the pallet explodes somehow and hurts somebody. It sort of makes you think of a product's liability type thing, even though I wasn't really selling pallets. I was selling the stuff that I put on the pallet. So how does that affect this handle? Sure, and that's a great point. The policy actually says that the product not only includes the product, but it includes the containers and the labels that the product is sold with. And so although the manufacturer might handle the product, there might be other entities that do so, such as the packager, whoever is responsible for selecting the packaging to make sure it's not a choking hazard for children, right? They didn't manufacture it, but they could still be liable in a product liability sense once that product makes its way to the ultimate consumer. And so what the courts have looked at that language and said, handled means something within the integrated process during the product's life cycle before it gets to the consumer. And in Terminix's view, anything that it handles while conducting its work, any chemicals, any tools, are magically transformed into its own product, right? But that's not the way product liability law works. For example, if there was a janitor in the hallway here mopping the floors using soap and water, and he leaves a puddle that one of us slips in, no one would say that the soap or the water were the janitor's products just because he handled them during his work. But that's essentially what the district court found and what Terminix is arguing in this case. The district court's interpretation of the word handled is improper for at least four reasons. Number one, the court's plucking the word handled out of context. Handled has to be given a meaning that's consistent with the other words in that sentence, right, the integrated process of the product. Number two, it creates inconsistency between the separately defined terms your work and your product. If the pesticides that Terminix furnishes on the job, right, and brings to the job, if they're already included within the policy's definition of your work and they're getting your work coverage, they shouldn't also qualify as a product liability risk on the other side of the policy. And third, it erases the California, what they've realized is a bright line distinction between premises operations coverage and products completed operations coverage. The janitor doesn't need products hazard coverage because he's already getting coverage onto the other side of the policy, right, the one that's exhausted already in this particular case. But there shouldn't be construed so that there's an overlap between these two coverages. And the fourth reason that handled, the district court's interpretation of handled is improper, is because no court in the nation, aside from the district court, has interpreted handled to mean touched. In the briefs, we cite numerous reviewing courts, Supreme Court cases from four different states, a Fifth Circuit case, and all of those cases interpret the word handled to mean an integrated process, right, not something that you happen to just touch while performing work. The only case that Terminix cites to support its view of handled is the Ninth Circuit's web court case. That was an unpublished decision, but it was also a product defect case. The insured was hired to assemble and deliver a finished product, a window system, to the San Francisco Intercontinental Hotel, and that product failed, and they were sued. And the court said, well, it's your product because you handled it. You actually assembled components of the system that were sold to the consumer down the line. That case does not stand for the proposition that merely touching something or handling it while performing work, contracting work, satisfies the product hazard coverage of the policy. Terminix is treating web court as a watershed precedent that completely erases the entire nature and scope of product-completed operations hazard coverage that has been recognized in California for decades. It just doesn't support that argument. They're reading it too thin. And finally, the district court erred by finding that Ferreira's injury didn't arise out of Terminix's possession of the pesticides that it sprayed at Starbucks. This concept of physical possession is also rooted in principles of product liability law. It's referring to goods that cause injury in the hands of the consumer, not while they're still on the assembly line in the hands of the manufacturer or seller. And so here, Ferreira's injuries easily arose out of Terminix's physical possession of the pesticides. That was literally the entire liability finding that we're being asked to pay. They were found liable for controlling and spraying the pesticides that made their way to Mr. Ferreira and caused his injuries. Rather than acknowledging this fairly obvious point, the district court engaged in almost a molecule-by-molecule analysis to determine when Terminix lost possession of these microscopic dust particles as they made their way to Mr. Ferreira. That's not the right standard here. His injuries certainly arose out of their possession and use of the pesticides, and so the product hazard coverage under this policy does not apply. Where this case belongs is in the ongoing operations side of the policy, and because that side was previously exhausted by Swiss Re's payment of $25 million on Terminix's behalf, we ask that the district court's order be reversed. Thank you. You'll reserve the rest of your time. Yes. Thank you. Good morning. May it please the court. My name is Raymond Massia, and I represent the appellee cross-appellant Terminix. Our cross-appeal does not concern the merits of the case, which we believe the district court correctly decided. Our cross-appeal concerns the district court's ruling on prejudgment interest and when it should have started to run on Terminix's breach of contract case. I'll address Swiss Re's appeal first, then I'll address my cross-appeal, and I'll reserve three minutes for rebuttal on the cross-appeal, if that's okay with the court. Yes. Okay, great. So the district court correctly held that the Ferreira judgment triggered coverage under the product prong of the product's completed operations hazard coverage. And for as much ink as we spilled on the briefs in this case, it's actually quite straightforward, and it starts with the policy language and the rules interpreting policies in California. Swiss Re sold as an add-on and for an extra premium the product's completed operations hazard to Terminix. Swiss Re broadly defined that coverage as applying to all bodily injury occurring away from your premises and arising out of your product or your work. Knowing that Terminix is an extermination company and fully understanding that its business involves the handling of pesticides when it applies them and distributes them at a customer's location, Swiss Re broadly defined the product prong as any goods or products manufactured, sold, handled, distributed, or disposed of by Terminix. The district court held that the alpine dust that Terminix puffed into the wall at the Starbucks was Terminix's product because it handled it by holding in a duster, manipulating it, and basically puffing it into the wall and treating areas that it was responsible for. This holding was correct, and I'd like to highlight three reasons why. First, as I said, this case really starts and ends with the rules governing insurance policy interpretation in California. First, because Swiss Re is seeking to exclude insurance coverage based on exceptions in the product's completed operations hazard, Swiss Re bears the burden of proving those exclusions, and not only do they bear the burden of proving those exclusions, they bear the burden to approve that they apply unmistakably and unambiguously to the facts of this case. This has a profound legal impact on the case because if we assert – if Terminix asserts any equally reasonable interpretation, as the district court accepted, we win. The second thing, second rule of interpretation is that if Terminix asserts any reasonable interpretation of any provision, whether that's a coverage grant or an exclusion, and Swiss Re advances an equally reasonable interpretation, we still win. The district court correctly applied these rules to the record and the policy language as confirmed by this court's decision in WebCorp. Swiss Re admits that there are two pathways to coverage here, the product prong and the work prong. As I mentioned, the product prong applies by its plain terms to any good or product handled by Terminix. Swiss Re's main contention in this case has been that that coverage doesn't apply to the alpine dust because alpine dust is not Terminix's product in that it doesn't manufacture and sell it as its own. But that's completely irrelevant. In WebCorp, this court confirmed that the product definition applies to products even if they are not manufactured or sold by the policyholder as its own product. Swiss Re essentially argues that the WebCorp case is distinguishable because they believe that, in that case, the subcontractor that installed the insulated glass unit into the frame that eventually was installed into a building was essentially just putting a product out into the market. And that's not really what that case was about. The WebCorp case was about faulty workmanship. The complaint was alleging that the work of the subcontractor was faulty because they used glue that they shouldn't have used in the insulated glass units. It's the same situation as our case. Terminix went to a job site, went to the Starbucks, and it installed a pesticide into the wall. It's the same case. Just because Terminix doesn't manufacture and sell it as its own is irrelevant. And I think it's also really important to look at the context of this case. The bottom line is there's not a single word or provision in the policy that says that the product prong coverage is limited to claims that are premised on a product defect or a product's liability claim, not a single word in the policy. It does not exist. Swiss Re wants to read it into the policy, but they can't. Now, Swiss Re's concern is that the district court, by interpreting the word handled as manipulating the product, that the district court is collapsing the product prong and the work prong. But that's not accurate because – and there's not a concern that the product prong will be collapsed with the work prong, and here's why. Pesticides are not any object that Terminix just simply touches when it goes to apply pesticides. Pesticides are the stock and trade of Terminix. It is their product. It is the product they use to deliver to its customers. So this is not the case where Terminix is seeking coverage for going to the Starbucks and, let's say, injuring someone with a ladder or dropping a hammer on someone's head and then claiming that that is our product. That is not this case. It's entirely distinguishable. Another point that Swiss Re raised was that essentially the district court just said that the mere touching, the mere touching of a product qualifies as product coverage. And that's not the case. The district court did not hold that the mere touching of a product – I went back to the example of using a hammer at a Starbucks or something like that. That perhaps could be a mere touching, but the district court didn't hold that. The district court held that Terminix manipulated the alpine dust by puffing it into the wall, and it's also Terminix's stock and trade. The Jalbert case from this court holds that – has interpreted the your product prong as goods or services which the insured deals in as a stock or trade. Does Terminix have a separate distribution business in the traditional sense like it sets up a contract with a company to distribute or sell its products like a Home Depot or something like that? No, they don't have that. But they do distribute pesticides when they go to a Starbucks, for example, and apply them. So the district court's interpretation of handled as manipulating a pesticide at the Starbucks is entirely consistent with the other terms in the product prong of selling and distributing. So the underlying facts of this claim seem pretty similar to the other claims that Swiss Re did pay out. So, I mean, what's the difference? I guess that's where I'm confused. Why is this products and those are work or – Two things on that, Your Honor. With respect to the Esmond claim, at no point did Swiss Re argue in this case that because the Esmond claim was an ongoing operations claim, the Ferrara claim had to be an ongoing operations claim. It wasn't at issue in the case. What Swiss Re simply said was we paid the Esmond claim as an ongoing operations claim. The facts of that case were never at issue. I will tell you that the Esmond case involved a four-day application where Terminix was fumigating a building for four days, which is very different than what happened at the Starbucks location where Starbucks went on a single – where Terminix went on a single day to the Starbucks, puffed alpine dust into the wall, and then left the job site. Very different case. The McCaughey claim where Swiss Re paid out under the products completed operations hazard, there is no evidence in the case about whether Swiss Re paid that under the your work prong or the your product prong. There's no evidence in the case. We didn't take any discovery on that issue. When we went to the initial conference before the district court, we said to the district court, look, we don't dispute – and both sides said this – we don't dispute that the Esmond claim was paid out under the general aggregate limit, nor do we dispute that the McCaughey claim was paid out under the products completed operations hazard. But the issue of whether McCaughey was paid as a product prong or a work prong was not in the case. We said to the district court that if you resolve this issue, it will basically resolve the whole case. If Terminix can prove that the Ferrara judgment was a products completed operations hazard, the case is over because there was about – there was like $11 million left in limits under the products completed operations hazard. So to answer your question, those claims, yes, they were at issue in the case, but they were only at issue in the case because they were facts that established what limits were remaining in the case, and that's all. In addition, they're also distinguishable from the case here. So with that, I'd like to move on to the physical possession exception to the products completed operations hazard. Having determined that Terminix demonstrated coverage, the district court then analyzed whether Swiss Re met its burden to prove that the physical possession exception to the products prong excludes coverage. The physical possession exception purports to exclude coverage for bodily injury arising out of products that are still in your physical possession. And what Swiss Re argues is that the physical possession exception applies because Terminix physically possessed the alpine dust at some point. And that's true. I mean Terminix did possess it at some point. But this is where the California rules of policy interpretation have a profound impact. Swiss Re has the burden of proving that that exclusion, that physical possession exclusion applies unmistakably and unambiguously to the facts of this case, and it fails for two reasons. First, Swiss Re is reading out the words still from the physical possession exception. The injury has to occur when Terminix is still in physical possession of the product. And second, the facts of the case show that the Ferrara action does not unmistakably fall within the terms of that exception. The claimant here was injured on the other side of an adjoining wall of the Starbucks and the beauty supply store. Terminix never entered the beauty supply store, nor was it treating that store. And, in fact, the plaintiff alleged that Terminix only controlled the pesticides on the other side of the shared wall of the premises, the Starbucks side. So Swiss Re can't meet its burden of proving that the physical exception – physical possession exception applies. One other thing I'd like to note, just to go back – I'm sorry to the product prong. One of the positions that Swiss Re takes is that the California courts have well settled that the product coverage only applies to products liability claims, and that's not accurate either. The Traveler's case clearly holds that the determining factor in whether the products prong applies is whether the injury occurs away from Terminix's premises or on Terminix's premises, and that's it. With that, unless the court has any questions, I'm going to move on to my cross-appeal. Okay, great. So while the district court correctly held on the merits, we believe that the district court incorrectly held that prejudgment interest on Terminix's breach of contract claim began to run on March 13, 2023, which was three years after Swiss Re denied coverage. And there are four reasons why we think this is incorrect. First, California law is very clear. Prejudgment interest runs from the date the insurance company repudiated liability or finally refused to pay. Swiss Re repudiated liability on April 13, 2020, when it advised Terminix that it would never cover the Farrar judgment. It just denied coverage in 2020 immediately after the judgment was rendered. Even though the law says that interest runs from that date, Swiss Re argued and the district court accepted that prejudgment interest should not run until the underlying primary policy beneath the Swiss Re policy exhausted. And what Swiss Re did is they relied on the exhaustion provision in their policy, which basically says that Swiss Re's liability under its policy doesn't attach until the underlying policy is exhausted through payment. And there are two reasons why reliance on that provision is incorrect. First, California law is very clear. Prejudgment interest is only delayed when the defendant doesn't know how much it owes because it's not fair to charge a defendant with an amount that it can't ascertain. Here, the amount was ascertainable. We had an $8 million judgment in 2020. We had a $3 million primary policy. $5 million of that was chargeable to the Swiss Re policy. Second, California law is also clear that an insurance company cannot repudiate all of its liability and then use a provision in its policy that is put there for its benefit. And that's what the exhaustion provision is. The exhaustion provision is a policy term that ensures that an excess insurance company doesn't drop down and pay before a primary policy or a lower policy in the tower because insurance companies insure levels of risk. And it would be unfair, admittedly, to have Swiss Re pay first dollar on a liability claim. But that does not mean that Swiss Re didn't have an obligation at the time the judgment was rendered. The Second Circuit has also held that under California law, prejudgment interest, the policyholder is entitled to recover it from an excess insurance company from the date of the loss when it is certain and ascertainable, notwithstanding that the underlying layers of coverage had not yet been exhausted. That's the Schwartz case in the Second Circuit in 2008. And the last thing I want to mention – well, two things I want to mention. Essentially, what I gather is that Swiss Re's argument is that there was no breach of contract claim in 2020 because the primary policy didn't exhaust yet. And the record just doesn't support that. In April of 2020, Swiss Re denied coverage. It said we're never going to pay for this claim under any circumstances. And then Terminix proceeded to appeal the underlying case through the California state court system. And over the course of three years, Terminix asked Swiss Re nine times to reconsider its coverage denial because Terminix wanted to use Swiss Re's limits to try to negotiate a settlement with the plaintiff without having to go all the way to the California Supreme Court. Every single time, Swiss Re said no. So there were multiple breaches over the course of three years. And then finally, there's a very important public policy argument here that I'd like to make. If the district court's ruling on prejudgment interest is affirmed, excess insurance companies will have no incentive to ever pay a claim because under the district court's ruling, Swiss Re could have paid $5 million in 2020. Or Swiss Re could have waited until 2023 and paid $5 million then without any consequence. So the result of that is that policyholders will not be able to settle underlying cases. They'll languish in the state court system. And I think the public policy just doesn't support that. So for that reason, we would ask that the court affirm the district court on the merits and reverse the district court on the prejudgment interest piece and rule that prejudgment interest began to run in 2020. Very well. Thank you, counsel. So for the remaining time, that is reserved on the prejudgment interest issue, not on the other side. That's right. All right. Thank you.  So just a few points on rebuttal. One of the arguments that Terminix makes concerns burden of proof. And they argue that we're trying to treat this product's completed operations hazard as an exclusion and such that because it's an exclusion and we're trying to exclude coverage under it, we as the insurance company owe the burden of proof to interpret that exclusion. That's not the way it works under California law. These are two different coverage grants. Each one has a $25 million limit associated with it. There's no exclusion here that we're trying to enforce. The way the product's completed operations hazard works is it defines work that's complete or products that are no longer in its possession because it's trying to carve out a path for different coverage for Terminix that's different than the premises operations coverage that it's getting on the other side of the policy. Fiberboard, again, there's a Fiberboard versus Hartford case, California Court of Appeals, explicitly states that this is a coverage grant. It has its own limit. It's not supposed to be interpreted as an exclusion. So Terminix's argument that it's like an exclusion is directly contrary to California law. Second, one of the arguments that Terminix counsel makes is that if they advance any interpretation of the policy that's reasonable, then they win. And that's only true if they advance a reasonable interpretation of the policy. They can't advance an interpretation of the policy that's contrary to the law or that leads to absurd results. And the interpretation that they're advancing here is directly contrary to the law. They're asking this court to create a new law that's not supported anywhere by Fiberboard or by any other reviewing court that's ever analyzed and interpreted the word handled. Third, they argue that the product prong isn't associated necessarily with only product liability risks. Again, that's contrary to several cases that we cite in our briefs, including Fiberboard, Baker, the Fifth Circuit, and all of those Supreme Courts that we cite. Fourth, Terminix argues that it does distribute and sell products. That's what it did at Starbucks. That's simply not true. They have a service contract. If you look at the service contract in the record, it actually says that Terminix can't sell products to Starbucks. And if Starbucks wants to buy products, it has to go through corporate to do that. So Terminix is not even allowed to leave or sell products to Starbucks. The only thing it's allowed to do is perform work, which is what it was hired to do in this case. And for those reasons, we ask that the district court's judgment be reversed. Thank you. You want to talk about the prejudgment interest? I know – If you have questions, I'm happy to answer them. I guess the one question I had is one of the points he made is he said under the district court's ruling, they could wait until 2023 as opposed to 2022. What's the incentive for them to ever pay? What's your response to that? Sure. So Swiss Re got notice of this lawsuit after it was already – it resulted in an $8 million judgment. And at that time, the notice letter that we got said, hey, Swiss Re, this happened. The trial court verdict is not supported by any evidence. We're going to file post-trial motions and an appeal if necessary. Let us know if you have any questions. It didn't say, hey, we want you to pay this immediately. They were controlling their own defense and making their own decisions under that policy, that primary policy. And so they tried to appeal. And in fact, they did win a new trial. The judgment was reversed. And so there wasn't a pending judgment during all those offers to Swiss Re or demands that we pay. They wanted to try to settle it. There was no active judgment that Terminix was liable to Mr. Ferreira at that time. They may have wanted to use our policy that was already exhausted to try to settle this claim, but it's not like any of the cases that they reference. And so under our policy, the only time that liability attaches is when the underlying limits are exhausted. We're not going to pay before the underlying policies pay. And in that case, it was in 2023 once the primary policy decided we've lost all of the appeals. We're ready to pay our limit. And so from that point forward, we have acknowledged, yes, we do have an obligation to pay the portion of pre-judgment interest that's associated with our share of the judgment. Thank you, counsel. Thank you. Just very, very briefly on the point that Swiss Re made that Terminix undertook an appeal on its own. Terminix did appeal the decision as any prudent insurance – as any prudent insured would do, particularly when its excess insurance company had denied coverage. I mean that is exactly what a policyholder should do, and that's exactly what an excess insurance company would urge its policyholder to do. And in fact, Swiss Re urged Terminix to do that in their initial declination letter in 2020. And then as I mentioned before, over the course of three years, there were numerous requests that Swiss Re reconsider its coverage denial. I'll just read a couple of quotes. Terminix requested that Swiss Re prepare to participate meaningfully in achieving a resolution during any settlement of mediation discussions regarding the Ferrara claim before a new trial begins. Swiss Re responded stating that its coverage position has not changed. I'm not going to go through every quote. They're very similar. It's the same back and forth nine times over the course of three years that Terminix requested that Swiss Re please support it in its effort to try to resolve the Ferrara judgment before it wasted three years appealing it to the California Supreme Court. And with that, I would just ask that the court reverse the prejudgment interest ruling of the district court. All right, thank you. Thank you both for your briefing and argument in this case. This matter is submitted. And this particular panel is adjourned. But I think both of you are continuing this week. We are. I am not. This is my last day. So thanks, everyone.
judges: OWENS, VANDYKE, THOMAS